UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

MICHAEL L. MILLER,                  )
                                    )
           Plaintiff,               )
                                    )        No. 2:12-cv-414
v.                                  )
                                    )        *Mattice / Lee*
COMMISSIONER OF SOCIAL SECURITY,    )
                                    )
           Defendant.               )

## REPORT AND RECOMMENDATION

Plaintiff Michael L. Miller brought this action pursuant to 42 U.S.C. §§ 405(g) seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying him disability insurance benefits ("DIB") and supplemental security income ("SSI"). Plaintiff has filed a motion for judgment on the pleadings and Defendant has filed a motion for summary judgment [Docs. 9 & 11]. Plaintiff alleges the Administrative Law Judge ("ALJ") did not incorporate all of his physical and mental limitations in the hypothetical question posed to the vocational expert ("VE") and did not properly assess his credibility, and that new and material evidence submitted to the Appeals Council requires remand of his claim. For the reasons stated below, I **RECOMMEND** that (1) Plaintiff's motion for judgment on the pleadings [Doc. 9] be **GRANTED IN PART** and **DENIED IN PART**; (2) the Commissioner's motion for summary judgment [Doc. 11] be **DENIED**; and (3) the Commissioner's decision denying benefits be **REVERSED** and **REMANDED** pursuant to Sentence Six of 42 U.S.C. § 405(g).

## I.     ADMINISTRATIVE PROCEEDINGS

Plaintiff initially filed his application for DIB and SSI on April 6, 2010, alleging disability as of April 15, 2009 (Transcript ("Tr.") 107-18).  Plaintiff's claims were denied initially and upon reconsideration and he requested a hearing before the ALJ (Tr. 59-76).  The ALJ held a hearing on April 8, 2011, during which Plaintiff was represented by an attorney (Tr. 32-50).  The ALJ issued his decision on June 6, 2011 and determined Plaintiff was not disabled because there were jobs in significant numbers in the economy which he could perform (Tr. 15-27).  The Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final, appealable decision of the Commissioner (Tr. 1-14).  Plaintiff filed the instant action on October 10, 2012 [Doc. 1].

## II.     FACTUAL BACKGROUND

### A.     Education and Background

Plaintiff was 40 at the time of the hearing before the ALJ and had completed the seventh grade in school (Tr. 36-37, 173).  Plaintiff could do some reading and had previously worked in city maintenance, as a loader in a cardboard box factory, a stocker in a retail store, and a beamer for a cloth manufacturer (Tr. 38-39).  Plaintiff had problems with back pain, which stayed mostly in his lower back; knee pain; and neck pain (Tr. 39-40).  Plaintiff took Motrin for the pain, which was prescribed by his doctor, and had never had steroid injections (Tr. 40-41).  Plaintiff had not been told he needed injections, and had never had any surgeries, but he was going to see a specialist soon to find out if those were necessary (Tr. 41-42).  Plaintiff testified he could sit for 30 minutes at a time before moving, and would not be able to spend half a workday seated (Tr. 42-43).  He testified he could not stand or walk for two hours out of an eight hour workday (Tr. 42).  Plaintiff further testified he could lift and carry a gallon of milk for one-third of a workday, but could probably not

2

carry a sack of potatoes for that long (Tr. 43).

Plaintiff also suffered from anxiety, agoraphobia, panic attacks and depression (Tr. 44-45). Plaintiff testified to having had eight panic attacks in the last week and generally had five or six in a normal week; he was taking medication and it was helping a little bit (Tr. 44-45). Plaintiff had problems dealing with stress, concentration and social situations and sometimes needed to be by himself (Tr. 45-46). Plaintiff experienced side effects from some of the medications he had tried for his anxiety and depression (Tr. 45-46). Plaintiff testified his panic attacks lasted up to an hour, possibly more, and he sometimes had problems leaving the house (Tr. 46).

### B. Vocational Expert Testimony

The ALJ sought the testimony of VE Donna Bardsley ("VE") during the hearing. The ALJ first asked the VE to assume an individual limited to light work, who could only perform simple, routine, repetitive tasks and could maintain concentration and persistence for only those types of tasks, could adapt to gradual and infrequent changes in the work setting, and was limited to work with no public interaction and only occasional interaction with coworkers and supervisors (Tr. 48). The VE testified that such an individual could not perform any of Plaintiff's past work, but could work as a cleaner, with 575 jobs in the region and 650,000 nationally; a general laborer, with 700 jobs regionally and 2,500,000 nationally; a hand packager, with 550 jobs in Tennessee and 700,000 in the United States; or a sorter, with 400 jobs in the region and 450,000 nationally (Tr. 48). The ALJ next asked the VE to assume an individual limited to light work who could not perform the basic mental demands of unskilled work due to a marked or substantial loss in at least one of those mental areas (Tr. 49). The VE testified this individual could neither perform Plaintiff's past work nor perform any jobs in the national economy (Tr. 49).

### C.    Medical Records

Plaintiff filled out a function report on April 23, 2010 and indicated a typical day involved laundry, doing dishes, checking on his neighbors, taking his dog out if it was nice, watching TV, and talking to his wife (Tr. 163).  Plaintiff stated he could not bend over, lift, walk a long way, stand for a long time, reach up, drive long distances or drive in traffic, or be around a lot of people, and had problems sleeping because he could not get comfortable (Tr. 164).  Plaintiff sometimes forgot to take his medication without a reminder, but he prepared basic meals daily, loaded the dishwasher, washed clothes, and could mow some every two weeks with some help (Tr. 165).  Plaintiff went outside every day, could drive a car by himself, shopped in stores for medication and personal hygiene items twice a month for 30 minutes at a time, and could pay bills (Tr. 166).  Plaintiff liked fishing, watching TV, and listening to gospel music, but he did not often fish anymore (Tr. 167).  He spent time with others daily and attended church regularly (Tr. 167).  Plaintiff estimated he could walk about 75 to 100 feet before stopping and resting for five to 10 minutes (Tr. 168).  Plaintiff had problems paying attention, but got along well with authority figures; he did not handle stress or changes well and had unusual fears (Tr. 168-69).  Plaintiff's pain questionnaire indicated problems with neck and left arm pain, the latter of which caused problems with reaching over head and lifting; he was taking Goody powders for the pain (Tr. 161-62).

4

### 1. Physical

Plaintiff followed with doctors at Medical Care, LLC for various complaints starting in 2005 and saw Dr. Kenneth Hopland on March 4, 2008 for a follow up on hypertension and complaining of left shoulder pain (Tr. 227-28, 255-62). On March 11, the pain had not improved and Plaintiff was referred to orthopedics (Tr. 229). Plaintiff saw Dr. Todd Fowler on March 21, and reported left shoulder pain that had started three or four years prior, but the symptoms had recently increased; Dr. Fowler noted the x-ray showed no acute bony change in the shoulder and a little AC joint arthritis, and there was also a little arthritic change shown in the x-ray of Plaintiff's cervical spine (Tr. 217-18). Plaintiff was diagnosed with impingement left shoulder, cubital tunnel left elbow, shoulder pain, and arm pain probably due to the cubital tunnel (Tr. 218).

Plaintiff continued to follow with Medical Care, LLC for hypertension and other minor complaints from 2008 to 2010; depression was sometimes noted on the treatment notes (Tr. 230, 235, 251-58, 263, 333-37). On June 2, 2010, Dr. Nathaniel Robinson filled out a physical residual functional capacity assessment form (Tr. 306-14). Dr. Robinson opined Plaintiff could lift and/or carry up to 50 pounds occasionally and 25 pounds frequently, could stand and/or walk for about six hours in an eight hour day, could sit for about six hours in an eight hour day, and was unlimited in his ability to push and/or pull (Tr. 307). Plaintiff was limited to only frequent overhead reaching with his left upper extremity (Tr. 309). Dr. Robinson opined Plaintiff's allegations of pain and limitations were only partially credible because he had only mild arthritic changes in the neck and shoulder and there was no medically determinable impairment in his back or knees (Tr. 313). Dr. Robinson's assessment was affirmed by another physician on August 20, 2010 (Tr. 332).

Plaintiff was seen at Medical Care on March 7, 2011 complaining of back and knee pain; on examination Plaintiff had a full range of motion and normal strength and tone (Tr. 344-45). Scans of Plaintiff's lumbar spine on this date revealed mild anterior osteophyte formation at the upper border of L4, but no fracture, disc space narrowing or other significant abnormality (Tr. 341). His left knee and right knee scans showed no fracture, joint effusion or degenerative changes (Tr. 342-43). On March 14, 2011, Plaintiff returned to go over his lab results and reported having problems with low back pain; he was diagnosed with diabetes (Tr. 350-51). A scan of his cervical spine the following day showed straightening of the normal cervical lordosis, which could be due to muscle spasm, and spondylosis at C6-7 (Tr. 349). An MRI of his lumbar spine revealed mild facet arthropathy at L4-L5 and L5-S1 (Tr. 354). Plaintiff returned on March 23, 2011 and his diabetes was better controlled with medication, his hypertension was well controlled, but he was still experiencing moderate low back pain (Tr. 352-53).

Plaintiff returned to Dr. Fowler on April 4, 2011 complaining of bilateral knee pain that increased with motion or weight bearing, intermittent edema, and popping of the knees; he also reported continued left shoulder pain, joint pain, and weakness (Tr. 357-58). On examination, there was tenderness in the medial joint of the patella tendon on both sides and a little grinding underneath the kneecap but not much popping or clicking with motion or compression (Tr. 357). Plaintiff was diagnosed with mild arthritis of the knees and knee and shoulder pain bilaterally (Tr. 358). Plaintiff also complained about back and neck pain and wanted to see a physician for those issues; Dr. Fowler noted Plaintiff had not had an arthritis profile done and ordered the profile (Tr. 358). Plaintiff returned one week later to follow up after blood work and reported no change in his joint pain; Dr. Fowler noted the blood work showed his rheumatoid factor was elevated and he was diagnosed with

probable rheumatoid arthritis (Tr. 359). Plaintiff was referred to a rheumatologist (Tr. 359).

The following evidence as to Plaintiff's physical impairments was submitted after the ALJ's decision. Plaintiff began following with Dr. Gerald Falasca for rheumatoid arthritis in June 2011 (Tr. 390). On July 26, 2011, Plaintiff complained of pain in his joints, stiffness for about two hours in the morning, problems with performing daily activities, and a pain level of 6/10 (Tr. 369-71). Radiographs of his hands this same date showed a possible old fracture in the right hand, normal joints, normal soft tissues, and no evidence of bony erosion (Tr. 372-73). Scans of Plaintiff's feet were also normal (Tr. 374-75). Plaintiff returned for follow up August 26, 2011 and reported doing better, with a pain level of 5/10 (Tr. 385-86). He received Remicade injections in September and October 2011; during his October visit, Plaintiff was doing a little better, but still had joint pain and stiffness, and stated the Remicade was helping (Tr. 401-05). Plaintiff continued receiving Remicade injections in December 2011 and January 2012 (Tr. 399-400). At his January 31, 2012 appointment, Plaintiff described his pain as aching and reported the injections were helping, but did not last until the next injection; his pain level was 8/10 (Tr. 397-98). During examination in March 2012, mild synovitis of the ankles was noted, but there was no synovitis in the hands (Tr. 394). Plaintiff acknowledged some improvement but did not think he would go back to work (Tr. 394).

### 2. Mental

Plaintiff had an intake therapy session at the Charlotte Taylor Center on July 3, 2006, during which he reported trouble sleeping, fear of dying and stopping his mental health medications after losing his insurance (Tr. 304-05). Plaintiff did not show for his next session, but returned on August 18, 2006 and reported panic and anxiety (Tr. 304). Plaintiff had a psychiatric evaluation on August 21, 2006 during which he complained of anxiety and worry that had previously been treated by his

7

primary care provider until he lost insurance; he reported having anxiety and panic attacks for 12 years (Tr. 295-96). Plaintiff sought to restart medications that had previously worked in the past; he reported having poor sleep, energy and concentration and his mood was down (Tr. 296). Plaintiff worried about everything all the time, avoided crowds, and had panic attacks five times a month (Tr. 296). Plaintiff was diagnosed with generalized anxiety disorder and panic disorder without agoraphobia and his Global Assessment of Functioning ("GAF") was 60[1] (Tr. 297-98). Plaintiff missed his next therapy session in September 2006 (Tr. 304). During his medication follow up on September 25, 2006, Plaintiff reported his mood was pretty good and his sleep had improved (Tr. 294-95). Plaintiff reported problems with Zoloft in February 2007 and reported his mood as "dizzy" (Tr. 293-94). Plaintiff missed his next appointment and did not return until January 21, 2008, when he was reevaluated for medication (Tr. 291-93). Plaintiff reported he was out of medication, which was causing marital problems, and his mood was down; he was diagnosed with panic disorder with agoraphobia and general anxiety disorder, and his GAF was 40 (Tr. 291-92). Plaintiff returned July 7, 2008 and reported being very anxious, he had stopped taking Zoloft because it made him feel weird, and he was experiencing a lot of stress; Wellbutrin was prescribed (Tr. 290). Plaintiff reported continued anxiety on November 18, 2008, fatigue, restlessness, and being on edge; he could not afford Wellbutrin and generic Paxil was prescribed (Tr. 289).

---

[1] A GAF score between 31 and 40 indicates "some impairment in reality testing or communication" or a "major impairment in several areas," a GAF score between 41 and 50 corresponds to a "serious" psychological impairment; a score between 51 and 60 corresponds to a "moderate" impairment; and a score between 61 and 70 corresponds to a "mild" impairment. *Nowlen v. Comm'r of Soc. Sec.*, 277 F. Supp. 2d 718, 726 (E.D. Mich. 2003).

8

Plaintiff started individual therapy again on February 18, 2009 and reported increased anxiety and panic attacks (Tr. 303). Plaintiff returned for a medication follow up on March 19, 2009 and reported medication problems, depression, and no energy (Tr. 287-88). Plaintiff cancelled his individual therapy sessions in March and May 2009, but on April 13, 2009, he reported recent anxiety from quitting his job and looking for work (Tr. 303). In June 2009, Plaintiff was doing well on the new medication (Tr. 286-87). At therapy on July 1, 2009, Plaintiff reported increased anxiety and difficulty in crowds (Tr. 302). He did not show for his August therapy session, but in September and October 2009, he reported increased anxiety and depression which was affecting his daily activities; driving and being in crowds increased his anxiety, while hunting and fishing reduced anxiety (Tr. 301-02). Plaintiff reported continued improvement during his medication appointments in September and December 2009 and March 2010 (Tr. 283-86). At his therapy session in December 2009, Plaintiff still complained of increased depression and anxiety and reported a low mood, worrying, poor sleep and lack of interest; he stated that change increased his anxiety (Tr. 300-01). Plaintiff did not return to therapy until March 2010, when he reported conflict at home was increasing his depression and anxiety (Tr. 299-300). During Plaintiff's therapy session on April 2, 2010, he reported increased depression and anxiety, increased panic attacks, recently losing his job, and poor concentration (Tr. 299).

On April 30, 2010, Dr. Edward Sachs filled out psychiatric review technique ("PRT") and mental residual functional capacity assessment ("MRFC") forms (Tr. 265-81). Dr. Sachs opined Plaintiff had mild restrictions in activities of daily living, moderate restrictions in maintaining social functioning and maintaining concentration, persistence and pace, and had had no episodes of decompensation (Tr. 275). Dr. Sachs opined Plaintiff's allegations were partially credible, but his

reported symptoms were not entirely consistent with the totality of the evidence, as his mental treatment records did not note significant problems with agoraphobia and activities of daily living (Tr. 277). Dr. Sachs more specifically opined on the MRFC that Plaintiff was moderately limited in understanding and remembering detailed instructions, carrying out detailed instructions, maintaining attention and concentration for extended periods, interacting appropriately with the general public, and responding appropriately to changes in the work setting; otherwise, Plaintiff was not significantly limited (Tr. 279-80). Dr. Sachs opined Plaintiff could remember and carry out simple one to three step tasks; maintain concentration, persistence and pace for periods of at least two hours over a workweek; could relate appropriately to supervisors and peers, but should have infrequent contact with the public; and could adapt to routine and infrequent changes in the workplace (Tr. 281).

On August 10, 2010, Dr. Robert Paul filled out PRT and MRFC forms (Tr. 316-31). Dr. Paul reached the same conclusions as Dr. Sachs and noted he affirmed Dr. Sachs' assessment (Tr. 316-31). Plaintiff returned for a medication follow up appointment on August 17, 2010 and was having increased panic and was ashamed he could not work any longer and was filing for disability (Tr. 340). At his medication appointment on November 10, 2010, Plaintiff was very distressed at his physical difficulties and had increased family stressors (Tr. 339-40). On February 1, 2011, Plaintiff was still anxious most of the time and worried about finances, but he felt his medications were effective (Tr. 338). During his therapy session on February 21, 2011, Plaintiff reported a low mood, worrying and panic attacks (Tr. 366). On March 25, 2011, Plaintiff was still having the same symptoms along with crying and reported his medical problems were affecting his mood, but attending church, spending time with family and fishing helped (Tr. 366). At his next therapy

10

session on May 2, 2011, Plaintiff reported similar symptoms and isolation; he attended an anxiety group session later in the month (Tr. 365). At his medication appointment on May 25, 2011, Plaintiff described continued symptoms of anxiety and depression, breaking out in sweats, avoiding church, isolating, and having panic attacks (Tr. 364).

The following evidence as to Plaintiff's mental impairments was submitted after the ALJ's decision. Plaintiff continued with individual therapy and the anxiety group in June and July 2011 and reported increased panic attacks, worrying and anxiety (Tr. 363). Plaintiff was doing well at his next medication appointment in August (Tr. 362, 413-14). During his individual therapy session on August 12, 2011, Plaintiff reported his brother had recently passed away and he was grieving and had problems with increased anxiety in public (Tr. 413). In September 2011, Plaintiff was depressed by the death of his brother and was experiencing a low mood, irritability, loss of interest, poor sleep, worrying and panic attacks (Tr. 413). During his October 2011 medication appointment, Plaintiff reported doing fair and was experiencing increased depression with low energy and decreased motivation (Tr. 411-12). Plaintiff did not like being around crowds and was still having occasional panic attacks (Tr. 412). At his therapy sessions in October, November and December 2011, Plaintiff reported depression and anxiety that were affected by his medical and financial problems (Tr. 410-11). Plaintiff returned for a medication appointment on January 18, 2012 and stated he was having increased anxiety, was often nervous throughout the day, and was having increased panic attacks (Tr. 409). Financial and family problems were contributing to his symptoms and Buspar was prescribed to reduce anxiety (Tr. 409). During therapy sessions in January, February and March 2012, Plaintiff reported continued anxiety and depression that reduced when he spent time with family, spent time outside, fished, and watched hunting movies (Tr. 407-08). In March, Plaintiff reported increased

11

panic attacks and depression due to grief (Tr. 407-08). At his medication appointment in April 2012, Plaintiff was fair, felt somewhat depressed and anxious at times but felt it was related to his home situation and financial problems, and felt his medication was helping the best it could (Tr. 406-07). Plaintiff reported feeling badly and providing for his family and stated he had tried to work several jobs but did not feel educated enough for many types of work (Tr. 406).

## III.    ALJ'S FINDINGS

### A.    Eligibility for Disability Benefits

The Social Security Administration determines eligibility for disability benefits by following a five-step process. 20 C.F.R. § 404.1520(a)(4)(i-v). The sequential process provides:

> 1) If the claimant is doing substantial gainful activity, the claimant is not disabled.
>
> 2) If the claimant does not have a severe medically determinable physical or mental impairment-i.e., an impairment that significantly limits his or her physical or mental ability to do basic work activities-the claimant is not disabled.
>
> 3) If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.
>
> 4) If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.
>
> 5) If the claimant can make an adjustment to other work, the claimant is not disabled.

*Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647 (6th Cir. 2009). The claimant bears the burden to show the extent of his impairments, but at step five, the Commissioner bears the burden to show that, notwithstanding those impairments, there are jobs the claimant is capable of performing. *See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).

## B. ALJ's Application of the Sequential Evaluation Process

At step one of this process, the ALJ found Plaintiff had not engaged in any substantial gainful activity since April 15, 2009, the alleged onset date (Tr. 20). At step two, the ALJ found Plaintiff had the following severe impairments: low back pain, neck pain, bilateral knee pain, anxiety, panic attacks, agoraphobia, and depression (Tr. 20). At step three, the ALJ found Plaintiff did not have any impairment or combination of impairments to meet or medically equal any of the presumptively disabling impairments listed at 20 C.F.R. Pt. 404, Subpt. P, App'x. 1 (Tr. 21). The ALJ specifically discussed his consideration of Listings 12.04 and 12.06 (Tr. 21). The ALJ determined Plaintiff had the residual functional capacity ("RFC") to perform light work in terms of the physical requirements, but he was limited to simple, routine, repetitive tasks, could maintain concentration and persistence for only those types of tasks, could adapt to gradual and infrequent changes in a work setting, and could only work in a setting with no public interaction and only occasional interaction with coworkers and supervisors (Tr. 23). At step four, the ALJ found Plaintiff could not perform his past relevant work (Tr. 26). After considering Plaintiff's age, education, work experience, and RFC, the ALJ found there were jobs that existed in significant numbers in the national economy which Plaintiff could perform (Tr. 26). This finding led to the ALJ's determination that Plaintiff was not under a disability from April 15, 2009, the alleged onset date (Tr. 27).

## IV. ANALYSIS

Plaintiff argues the hypothetical question posed to the VE did not adequately incorporate all of his physical and mental limitations and that the limitations in the ALJ's RFC determinations do not address his mental difficulties. As part of his argument, Plaintiff asserts the ALJ erred in not finding him fully credible. Plaintiff also claims that new and material evidence requires remand of

13

his claim to the ALJ.

## A.    Standard of Review

A court must affirm the Commissioner's decision unless it rests on an incorrect legal standard or is unsupported by substantial evidence.  42 U.S.C. § 405(g); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004) (quoting *Walters*, 127 F.3d at 528).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Garner v. Heckler*, 745 F.2d 383, 388 (6th Cir. 1984) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).  Furthermore, the evidence must be "substantial" in light of the record as a whole, "tak[ing] into account whatever in the record fairly detracts from its weight."  *Id.* (internal quotes omitted). If there is substantial evidence to support the Commissioner's findings, they should be affirmed, even if the court might have decided facts differently, or if substantial evidence would also have supported other findings.  *Smith v. Chater*, 99 F.3d 780, 782 (6th Cir. 1996); *Ross v. Richardson*, 440 F.2d 690, 691 (6th Cir. 1971).  The court may not re-weigh evidence, resolve conflicts in evidence, or decide questions of credibility.  *Garner*, 745 F.2d at 387.  The substantial evidence standard allows considerable latitude to administrative decisionmakers because it presupposes there is a zone of choice within which the decisionmakers can go either way, without interference by the courts. *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994).

The court may consider any evidence in the record, regardless of whether it has been cited by the ALJ.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The court may not, however, consider any evidence which was not before the ALJ for purposes of substantial evidence review.  *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001).  Furthermore, the court is under no obligation to scour the record for errors not identified by the claimant, *Howington v. Astrue*, No.

14

2:08-CV-189, 2009 WL 2579620, at *6 (E.D. Tenn. Aug. 18, 2009) (stating that assignments of error not made by claimant were waived), and arguments not raised and supported in more than a perfunctory manner may be deemed waived, *Woods v. Comm'r of Soc. Sec.*, No. 1:08-CV-651, 2009 WL 3153153, at *7 (W.D. Mich. Sep. 29, 2009) (citing *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997)) (noting that conclusory claim of error without further argument or authority may be considered waived).

## B.      Sentence Six Remand

Plaintiff argues his claim should be remanded to the Commissioner because soon after the hearing before the ALJ, Plaintiff began treatment with Dr. Falasca for rheumatoid arthritis [Doc. 10 at PageID# 41]. Plaintiff contends this evidence is new and material because it provides a reason for the subjective distress Plaintiff complained of at the hearing and, therefore, it relates back to his condition at the time of the ALJ's decision; Plaintiff also asserts there was good cause for the failure to submit the evidence earlier because it did not exist at the time of the decision [*id.* at PageID# 41-42].

The Commissioner observes that some of the evidence submitted for Appeals Council review were records from the Charlotte Taylor Center, but Plaintiff made no specific argument about those records in his brief before the Appeals Council and any argument in that regard is waived [Doc. 12 at PageID# 59]. The Commissioner argues the treatment records from Dr. Falasca do not warrant remand of the claim because, although Plaintiff testified at the hearing that he was to see a specialist in the next few weeks, his counsel did not seek to have the record remain open to submit additional evidence following this appointment [*id.* at PageID# 59-60]. The Commissioner contends this in itself establishes a lack of good cause for remand; but, that even if there was good cause for not

15

submitting the evidence before now, Plaintiff has not shown the evidence is material [*id.* at PageID# 60]. The Commissioner argues the ALJ already had a "probable" diagnosis in the record and the only record before his decision was the official diagnosis; otherwise, all records are from dates after the ALJ issued his decision [*id.*]. Finally, the Commissioner asserts that even if the new records were material to the time period at issue, they indicate normal examination findings and normal objective testing results besides some mild or slight findings, and thus there is no probability the ALJ would have altered his decision, and remand is not appropriate [*id.* at PageID# 61].

Evidence submitted to the court after the close of administrative proceedings cannot be considered for purposes of substantial evidence review. *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). Similarly, where the claimant presents new evidence to the Appeals Council, but the Appeals Council declines to review the ALJ's decision, that new evidence may not be considered during review on the merits. *Cotton v. Sullivan*, 2 F.3d 692, 695-96 (6th Cir. 1993). Instead, the new evidence can be considered only for purposes of remand pursuant to sentence six of 42 U.S.C. § 405(g), which authorizes the court to remand a case for further administrative proceedings "if the claimant shows that the evidence is new and material, and that there was good cause for not presenting it in the prior proceeding." *Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996). "New evidence is cumulative and not sufficient to warrant remand if it relates to an issue already fully considered by the Commissioner . . . [a]dditionally, evidence that a Plaintiff's health has deteriorated since the Commissioner's decision is not material to that application, and the appropriate remedy is to file a new application." *Farler v. Astrue*, No. 1:10-cv-657, 2011 WL 3715047, at *6 (S.D. Ohio July 29, 2011) (citations omitted). The evidence is material "only if there is a 'reasonable probability that the Secretary would have reached a different disposition of the

16

disability claim if presented with the new evidence.'" *Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 276 (6th Cir. 2010) (quoting *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001)); *see also Bass v. McMahon*, 499 F.3d 506, 513 (6th Cir. 2007) ("Material evidence is evidence that would likely change the Commissioner's decision").

I **FIND** the evidence submitted here is new; in fact, it spans several months after the ALJ's decision. Plaintiff's argument that there was good cause for the failure to provide this evidence earlier centers on the proposition that this "new" diagnosis explains and supports Plaintiff's subjective complaints of pain as of the hearing. As the Commissioner notes in response, there was a probable diagnosis of rheumatoid arthritis in the record and Plaintiff referenced seeking treatment from a specialist at the hearing; as such, the Commissioner faults Plaintiff's attorney for not seeking to keep the record open for new records. However, this probable diagnosis of rheumatoid arthritis was made by Dr. Fowler on April 11, 2011, and the hearing before the ALJ was held on April 8, 2011. Plaintiff's attorney logically could not know of this probable diagnosis at the time; in addition, Plaintiff's reference during the hearing to seeing a specialist likely refers to a treatment note by Dr. Fowler at Plaintiff's April 4, 2011 appointment, which indicates he would try to set Plaintiff up with one of the back and neck physicians in the practice (Tr. 357-58). Plaintiff was not referred to a rheumatologist until his follow up appointment with Dr. Fowler on April 11, 2011 (Tr. 359). Accordingly, I **FIND** there was good cause for Plaintiff's failure to produce the records earlier, as they did not exist and Plaintiff's attorney would not have known such records would soon exist at the time of the hearing.

As to the materiality of this new evidence, although the Commissioner observes the probable diagnosis of rheumatoid arthritis was already in the record at the time of the ALJ's decision, this probable diagnosis was never mentioned in the ALJ's decision, and the ALJ's assessment of Plaintiff's credibility makes no reference to the April 11, 2011 treatment note (Tr. 24-25).[2] The ALJ relied upon generally unremarkable x-rays and MRIs of Plaintiff's spine and knees, along with Dr. Fowler's April 4, 2011 notes concerning Plaintiff's knee pain and Plaintiff's function report of April 2010, to find that Plaintiff's subjective complaints were not entirely credible (Tr. 24-25). Given the potential impact Plaintiff's probable (and now apparently confirmed) diagnosis of rheumatoid arthritis could have on the ALJ's assessment of Plaintiff's credibility, and the impact the official diagnosis and treatment records from Dr. Falasca could also have on this assessment, I **FIND** the evidence is material.

It is true, as the Commissioner observes, that Plaintiff's treatment with Dr. Falasca has involved some mild objective findings, and it is further true that a diagnosis alone does not speak to the condition's severity or whether it is disabling. *See Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988); *Foster v. Bowen*, 853 F.2d 483, 489 (6th Cir. 1988). However, the ALJ focused on records of Plaintiff's physical treatment and an older function report to assess his physical complaints and credibility and did not discuss evidence that Plaintiff possibly had rheumatoid

---

[2]  Although exhibit 18F, which contains Dr. Fowler's most recent treatment notes, was not admitted as an exhibit for the record during the hearing, it was apparently made an exhibit later. The ALJ specifically discussed Dr. Fowler's April 4, 2011 notes and referenced exhibit 18F in his decision and presumably had the entire exhibit at the time of the decision (Tr. 24-25, 34, 355-61). The ALJ does acknowledge Dr. Fowler's April 11, 2011 treatment note earlier in the decision, but only to note that "Dr. Fowler indicated that the claimant's lab work showed an elevated rheumatoid factor of 28" (Tr. 21). The ALJ did not reference the probable diagnosis of rheumatoid arthritis at any point in his decision.

18

arthritis, a condition it appears was not contemplated by any physician prior to his treatment with Dr. Fowler. This condition, which apparently existed at the time of hearing and the decision but was not considered by the ALJ, could lend support to Plaintiff's subjective complaints of disabling pain more so than the objective testing that was previously done for other conditions and complaints.[3]

In addition, the new records show Plaintiff reported joint pain, stiffness and aching pain at moderate to high levels even after receiving treatment. Assessing Plaintiff's complaints with this new information and considering his impairments in combination could materially change the ALJ's determination as to Plaintiff's credibility, could change the ALJ's RFC determination, or could require the consideration of other Listings. As such, there is a reasonable probability the ALJ's decision would be altered by the consideration of this new evidence.

---

[3] This Court previously decided a Sentence Six remand was appropriate in a case with somewhat analogous facts. In *Graham v. Astrue*, No. 1:08-cv-194, 2009 WL 2849661 (E.D. Tenn. Aug. 31, 2009) (Mattice, J.), the district judge adopted a report and recommendation which, in part, recommended remand under Sentence Six for consideration of new evidence confirming a neurological impairment. *Id.* at *14-15. The report and recommendation observed that the evidence confirming this diagnosis occurred between the hearing and the ALJ's decision, but had not been provided to the ALJ prior to the decision; however, it was material because "[a]lthough the record is replete with instances where Plaintiff was reporting frequent headaches. . . her doctors at the time could not pinpoint an orthopaedic reason because the cause of the headaches was discovered to be neurologic in origin." *Id.* at *15. Once the diagnosis was made, however "compelling objective evidence . . . supported Plaintiff's complaints of disabling headaches." *Id.* The ALJ "clearly demonstrated in his decision that he considered this case to be orthopaedic in nature" when, in fact, there was new objective evidence of an additional neurological impairment to support the plaintiff's subjective complaints of severe headaches. *Id.* Similarly, in this case, the diagnosis of rheumatoid arthritis provides more support for Plaintiff's subjective complaints of pain, which were previously addressed only in the context of scans to determine if Plaintiff had degenerative changes in his spine and bones.

19

Accordingly, I **CONCLUDE** Plaintiff's claim must be remanded to the Commissioner under Sentence Six of 42 U.S.C. § 405(g) for consideration of the new evidence regarding Plaintiff's rheumatoid arthritis diagnosis and treatment.[4]

## V.  CONCLUSION

Having carefully reviewed the administrative record and the parties' arguments, I **RECOMMEND** that:[5]

> (1)  Plaintiff's motion for judgment on the pleadings [Doc. 9] be **GRANTED IN PART** to the extent it seeks remand pursuant to Sentence Six of 42 U.S.C. § 405(g) and **DENIED IN PART** to the extent it seeks reversal and an award of benefits based on a lack of substantial evidence.

> (2)  The Commissioner's motion for summary judgment [Doc. 11] be **DENIED**.

---

[4] Plaintiff has made another, somewhat related argument with respect to his credibility and the ALJ's RFC determination. Because the ALJ's RFC determination may change upon remand of the claim, I do not further address this argument here.  In addition, in a "pre-judgment" sentence six remand, "the court does not rule in any way on the correctness of the administrative decision, neither affirming, modifying, or reversing the decision of the Secretary."  *Faucher v. Sec'y of Health & Human Servs.*, 17 F.3d 171, 174 (6th Cir. 1994); *see also Melkonyan v. Sullivan*, 501 U.S. 89, 98 (1991).

[5] Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party.  Such objections must conform to the requirements of Rule 72(b) of the Federal Rules of Civil Procedure. Failure to file objections within the time specified waives the right to appeal the district court's order. *Thomas v. Arn*, 474 U.S. 140, 149 n.7 (1985).  The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive and general.  *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986).  Only specific objections are reserved for appellate review.  *Smith v. Detroit Fed'n of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).

(3)     The Commissioner's decision denying benefits be **REVERSED** and **REMANDED** pursuant to Sentence Six of 42 U.S.C. § 405(g) for action consistent with this Report and Recommendation.

(4)     This case be **ADMINISTRATIVELY CLOSED** while the Commissioner reviews the new and material evidence upon remand.[6]

s/ *Susan K. Lee*
SUSAN K. LEE
UNITED STATES MAGISTRATE JUDGE

---

[6] Sentence Six of 42 U.S.C. § 405(g) provides that the Commissioner shall, "after the case is remanded, and after hearing such additional evidence if so ordered, modify or affirm the Commissioner's findings of fact or the Commissioner's decision, or both, and shall file with the court any such additional and modified findings of fact and decision." *See also Melkonyan*, 501 U.S. at 98. Therefore, this Court retains jurisdiction over this action such that should Plaintiff be dissatisfied with the new decision of the Commissioner on remand, Plaintiff may petition the Court for entry of an Order reinstating the case on the active docket for judicial review of the new decision. Plaintiff must file said petition within 30 days of the date of the Commissioner's new decision. Should both sides be satisfied with the Commissioner's new decision following remand, the prevailing party shall, within 30 days of the Commissioner's decision, petition the Court for entry of a Final Order adopting and ratifying the new decision.

21